UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICKIE DONALD,

         Petitioner,

    v.

STUART SHERMAN, Warden,

         Respondent.

Case No. 15-cv-04907-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Petitioner Nickie Donald, a state prisoner currently incarcerated at the California Substance Abuse Treatment Facility brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2013 conviction and sentence rendered in the Contra Costa County Superior Court.

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES all claims in the petition for the reasons set forth below.

## II.    BACKGROUND

The California Court of Appeal described the relevant facts as follows:

> Around 10:00 p.m., on June 25, 2010, Asama Ayyad and Odey Saeidah were driving in a white Lexus with tinted windows on Bissell Avenue in Richmond, California. While at the intersection of Bissell and 22nd Street, Saeidah, the passenger, looked in the right side view mirror and noticed a white van approach. The van pulled up on the passenger side of the Lexus. Saeidah saw an African-American male in a white t-shirt "hanging out of the window." The man suddenly started shooting into the passenger-side window with a semi-automatic handgun. The window was rolled up when the shooting began. The van was slowly moving forward as the driver shot into the Lexus. As Ayyad drove away, the man in the van kept shooting at their car.
>
> Saeidah was shot in the thigh and the bullet passed entirely through his leg. Ayyad had been shot in the right side of his body. Although he was able to drive a short distance, he soon fainted and the car crashed into a light pole. Saeidah testified that neither he nor Ayyad

was carrying a gun and they did not do anything to provoke the shooting. Ayyad died that evening of a gunshot to the chest.

Arei Lewis was riding in the van with defendant and four other men at the time of the shooting. There were three rows of seats in the van, and Lewis was riding in the rear seat. Defendant was driving. As they approached the intersection of 23rd and Bissell, Lewis heard someone in the van say, "Is that the same car from earlier?" The men were referring to a Lexus coupe stopped at the light. Then, someone asked whether there was a gun in the car. Lewis heard the men talking, and a gun was passed up to defendant from the middle seat. When the light changed, defendant made a left on to Bissell to follow the Lexus. Defendant stopped at the intersection of 22nd and Bissell beside the Lexus. A few seconds later, defendant fired six or seven gunshots into the Lexus. He handed the gun back to one of the other men and drove from the scene.

Richmond Police Officer Miles Bailey was on patrol in the area when he heard multiple gunshots. He drove in the direction of the gunshots and within a minute after the shots were fired he saw defendant's van travelling away from the scene of the shooting at a high rate of speed. The officer followed the van and activated his overhead lights and siren.

Within seconds of the shooting, Lewis heard police sirens. She heard the men talk about getting rid of the gun and heard one of them say, "Get the shells out of the car. Get the shells out of the car." One of the men rolled down his window and threw the gun out of the car into some bushes or trees. The men started taking money from the front seat and putting it into Lewis's purse. They told her to act like she was asleep.

When defendant pulled over, the police officer ordered everyone out of the van. The officers went through Lewis's purse and found the money that had been passed back to her. Initially, Lewis told the police that one of the other men, not defendant, was the shooter. When the officers confronted her with conflicting evidence, she acknowledged that defendant fired the gun. Lewis told them where the gun had been thrown and pointed out the location of the shooting. Lewis told the police that she was afraid to testify about the incident, and she expressed concern for her family's safety. Her purse was taken from her that night, and she subsequently began to receive calls and text messages telling her that she must return the money because defendant needed it for his lawyer. The threatening text messages were provided to the police and their content admitted at trial. On cross-examination, Lewis acknowledged that she was smoking marijuana in the van prior to the shooting.

Police Detective Avon Dobie testified that when he interviewed Lewis shortly after the shooting she reported hearing the men say "There goes that white car" or "There goes that white coupe" and someone else said, "We need to follow—we need to get that car." Officers recovered a .40-caliber semi-automatic handgun in the shrubbery near where the van was pulled over. Bullets removed from the Lexus and Ayyad's body were consistent with the gun, but there were insufficient markings to determine whether they were

actually fired from that gun.

Defendant testified that prior to the shooting he had taken two Valium pills, four Ecstasy pills, and drank "bo," a mixture of promethazine and codeine.  He testified that just prior to the shooting, he noticed that someone behind him was driving close to him and had their high-beam headlights on.  He did not say anything to the others in the car because he did not want them to think he was having a panic attack for no reason, but he did circle around the block.  As he turned from 23rd onto Bissell, he heard someone in the van mention a white car.  When he saw the white car pulling up alongside them on Bissell, he asked the others if there was a gun in the car and someone passed him a gun.  Defendant admitted that he fired the gun at the white car, "one shot after the other."  His sole testimony as to why he fired the gun was as follows:  "Q.  Why did you shoot the gun?  A.  Because I panicked."[FN 2]

[FN 2:]  Shortly after this answer, on direct examination, defendant was asked whether he saw the passenger window of the white car was "cracked," i.e., lowered, when he fired the gun, and he answered, "I couldn't really get a view because it happened too quick."  On cross-examination, he testified that someone in the van had yelled "the window was cracked."  He took it as "it [the window] was going down."

Presumably in explanation of why he "panicked," defendant presented evidence that he had been shot by people riding in white cars on three separate occasions in the prior six months and he testified that he was anxious about seeing white cars.  Defendant's uncle testified that defendant was shot in December 2009 by someone in a large "beige-ish white" four-door sedan.  The car passed by their residence slowly and then returned and stopped in front of house.  There were three or four people in the car at the time.  Defendant was standing in the driveway near the porch when he was shot.  Defendant testified that as a result of the shooting he "had a lot of sharp pain shooting through [his] head and headaches, migraines, things like that."  He testified that he had anxiety after being shot.  Asked what he was anxious about, he responded, "I don't like seeing white cars and I continue to hear multiple gunshots going off in my head."

Defendant also testified that in May 2010 he got into a shootout with two Miles brothers driving a white Camry.  He claimed that he had a long-standing dispute with the brothers and they drove by his house and started shooting.  He shot back, but his gun jammed.  Testimony was presented that one of the brothers claimed that defendant began shooting at their car first and kept shooting until his gun jammed.

Finally, defendant testified that in early June 2010, he was again shot at by two people driving in a white, two-door Lexus.  He did not know who the men were because they were wearing hats and he did not get a good look at them.

Defendant's cousin also testified that defendant was afraid of white cars.  He was particularly scared when he saw white Lexus coupes.  He testified that if he and defendant were driving and they saw a

> white Lexus coupe, the cousin would "try to make sure that the car would be on my side instead of being on [defendant's] side . . . to make him feel more protected. So I would necessarily get shot instead of him."
>
> Expert psychologist Andrew Pojman testified that defendant has post-traumatic stress disorder and that people with the disorder often respond to visual cues associated with a past trauma with an exaggerated fight or flight response.

*People v. Donald*, A139326, 2015 WL 1250446, *1-3 (Cal. Ct. App. Mar. 17, 2015).

Petitioner was charged with first degree murder (Cal. Penal Code § 187; count 1), attempted murder (Cal. Penal Code §§ 187/664; count 2), shooting at an occupied vehicle (Cal. Penal Code § 246; count 3), and shooting from a motor vehicle (Cal. Penal Code § 12034(d); count 4). *Id.* at *1. The information also alleged in connection with all counts that Petitioner personally used a firearm (Cal. Penal Code § 12022.53) and that he committed the offenses to benefit a street gang (Cal. Penal Code § 186.22). *Id.*

Petitioner was convicted on all counts as charged, and the firearm use enhancements were found true. *Id.* at *3. The gang enhancement was not found true. *Id.* On June 27, 2013, Petitioner was sentenced to prison for 77 years and four months to life in prison. *Id.*; Dkt. 1 at 1.

Petitioner appealed his conviction to the California Court of Appeal. On March 17, 2015, the California Court of Appeal affirmed the convictions. *Donald*, 2015 WL 1250446, *8.

On April 17, 2015, Petitioner filed a petition for review in the California Supreme Court. Resp't Ex. D. On June 17, 2015, the California Supreme Court denied review. Resp't Ex. E.

On October 26, 2015, Petitioner filed the instant petition, which alleged the same claims raised in his state petition for review. Dkts. 1, 1-1.

On December 4, 2015, this Court issued an Order to Show Cause. Dkt. 6. Respondent filed an Answer. Dkt. 10. Although he was given the opportunity to do so, Petitioner did not file a Traverse. The matter is fully briefed and ripe for adjudication.

## III.    LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

1    Even if constitutional error is established, habeas relief is warranted only if the error had a

2    "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*,

3    532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

4    On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

5    state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

6    *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the

7    above standards on habeas review, this Court reviews the "last reasoned decision" by the state

8    court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

9    When there is no reasoned opinion from the highest state court to consider the petitioner's

10   claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06

11   (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court

12   will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and

13   analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court

14   precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir.

15   2000). The last reasoned decision in this case is the state appellate court's unpublished disposition

16   issued on March 17, 2015. *See* Resp't Ex. C; *Donald*, 2015 WL 1250446, *1-8.

17   **IV.    DISCUSSION**

18       **A.    Instructional Error - Imperfect Self-Defense**

19   The state appellate court gave the following background relating to this claim:

20       The jury was instructed, pursuant to CALCRIM No. 571 as follows:
         "A killing that would otherwise be murder is reduced to voluntary
21       manslaughter if the defendant killed a person because he acted in
         imperfect self-defense. [¶] If you conclude the defendant acted in
22       complete self-defense, his action was lawful and you must find him
         not guilty of any crime. The difference between complete self-
23       defense and imperfect self-defense depends on whether the
         defendant's belief in the need to use deadly force was reasonable.
24       [¶] The defendant acted in imperfect self-defense if: [¶] 1. The
         defendant actually believed that he was in imminent danger of being
25       killed or suffering great bodily injury; [¶] AND [¶] 2. The
         defendant actually believed that the immediate use of deadly force
26       was necessary to defend against the danger; [¶] BUT [¶] 3. At
         least one of those beliefs was unreasonable. [¶] Belief in future
27       harm is not sufficient, no matter how great or how likely the harm is
         believed to be. [¶] In evaluating the defendant's beliefs, consider
28       all the circumstances as they were known and appeared to the

6

defendant.  [¶]  *If you find that the defendant received a threat from someone else that he reasonably associated with Asama Ayyad, you may consider that threat in evaluating the defendant's beliefs. . . ."* (Italics added.)

The jury was instructed, pursuant to CALCRIM No. 604, with the parallel imperfect self-defense instruction for attempted murder.

*Donald*, 2015 WL 1250446, *3.

Petitioner claims the trial court improperly instructed on imperfect self-defense pursuant to CALCRIM Nos. 571 and 604.  Dkt. 1 at **5**.[1]  Petitioner argues specifically that the trial court improperly included the "bracketed language" (*see* italicized language above) in both instructions to the effect that evidence of third party threats may be considered if the defendant "reasonably" associated the victim with those threats.  *Id.*, Dkt. 1-1 at 7-28.  He argues that including the bracketed language was potentially misleading because, in the context of imperfect self-defense, the defendant's association of the victim with third party threats need not be "reasonable," stating as follows:  "Evidence of third party threats may support a claim of *imperfect* self-defense if there is evidence that 'the defendant actually, *even if unreasonably*, associated the victim with those threats.'"  *Id.* at 19 (citing *People v. Minifie*, 13 Cal. 4th 1055, 1069 (1996)) (italics in original).

The state appellate court rejected Petitioner's instructional error argument relating to imperfect self-defense and stated as follows:

> Defendant contends these instructions improperly require that he "have 'reasonably' associated a prior threat by someone else with the victims . . . in order to consider the threat in evaluating imperfect self defense."  Although the instructions given were taken directly from the standard CALCRIM instructions, and no objection to them was made in the trial court, defendant now argues that evidence of third party threats may support a claim of imperfect self defense if there is evidence that "the defendant actually, even if unreasonably, associated the victim with those threats."  His contention is supported by dictum in *People v. Minifie* (1996) 13 Cal. 4th 1055, 1061-1063, 1069.  In that case the court held that the defendant should have been allowed to present evidence that he had received numerous threats on his life from specific third-parties, and in dictum "note[d] that this case involves an assault, not a homicide, and thus no question of imperfect self-defense is presented.  [Citation.]  To support a claim of imperfect self-defense, evidence of third party threats may also be admissible if there is evidence the defendant actually, even if unreasonably, associated the victim with

United States District Court
Northern District of California

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

7

those threats." (*Id.* at p. 1069; *see also People v. Mills* (2012) 55 Cal. 4th 663, 678-679, fn. 10.)

Even assuming that the issue may be considered on appeal despite the failure to have objected in the trial court, and that the *Minifie* dictum correctly states the law, the failure to give the correct instruction in this case clearly was not prejudicial. Although the jury was instructed on imperfect self-defense, the defendant's defense at trial was complete self-defense, not imperfect self-defense. That was defendant's contention in the opening and closing statements and throughout the trial. Moreover, defendant's evidence failed to lay a foundation for imperfect self-defense. Defendant did not testify that the reason he fired shots at the victims' car was that he thought someone in the car was about to shoot him; his only testimony was that he "panicked." Even assuming that the testimony of prior shootings by people in a white car would support the inference that he feared that those people were in the white Lexus coupe, he testified that he did not see who those people were and did not know who they were. Asked whether he thought the Lexus coupe could have been the car of the Miles brothers, with whom he testified to a prior exchange of gunshots, he responded "I wasn't sure." Defendant also testified that he did not see that the window of the Lexus was lowered (although on cross-examination he added that someone in the van had yelled that the window was "cracked"), and he certainly did not testify that he believed he would be shot from the other car if he did not fire first. Defense counsel did not even argue imperfect self-defense in closing argument, focusing entirely on complete self-defense. Finally, viewing the record as a whole, there is no likelihood that a correct instruction on third-party threats would have resulted in a more favorable outcome for defendant. In contrast to defendant's testimony that he panicked when he observed the white Lexus approach his van from behind, there was overwhelming testimony from numerous witnesses that it was the van that pulled up beside the Lexus, leading to the unprovoked shooting. And the prosecutor's cross-examination brought out numerous inconsistencies in defendant's testimony and repeated admissions of past lies. An instruction to the jury that a belief that the persons in the white car were the prior shooters need not have been reasonable undoubtedly would not have changed the outcome of trial.

*Donald*, 2015 WL 1250446, *3-4.

### 1.    Applicable Law

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *see, e.g.*, *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review). To obtain federal habeas relief for error in the jury charge, the petitioner also must show actual prejudice from the error, i.e., that the error had a

substantial and injurious effect or influence in determining the jury's verdict. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998) (per curiam) (citing *Brecht*, 507 U.S. at 637). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72.

The federal habeas court must defer to a state court's reasonable application of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). Where a state court expressly held that a jury instruction correctly set forth state law, it is not the province of a federal habeas court to reexamine the state-court determination that rests on state-law grounds. *Waddington*, 555 U.S. at 192 n.5 (once federal habeas court concludes that state court reasonably found an instruction was unambiguous, federal habeas court should end its inquiry). A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (citing *Estelle*, 502 U.S. at 67-68); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988) (even a determination of state law made by an intermediate appellate court must be followed).

### 2.      Analysis

The state appellate court first noted that Petitioner had forfeited this instructional error claim by failing to raise the issue at the trial court level. *Donald*, 2015 WL 1250446, *4. Nonetheless, the state appellate court found that, assuming the *Minifie* dictum correctly stated the law, there was no prejudice in giving the instruction on evidence of third party threats because Petitioner's defense was *complete* self-defense, not imperfect self-defense. *Id.* The state appellate court also found that Petitioner did not present evidence which would have laid a foundation for imperfect self-defense. *Id.* Therefore, the state appellate court found no due process violation in the trial court's inclusion of the term "reasonably" in that portion of the instruction which related to consideration of evidence of third party threats. *Id.*

The state appellate court's conclusion that there was no substantial evidence to support imperfect self-defense was a factual determination binding on federal habeas corpus. The state appellate court's factual findings are presumed correct, unless Petitioner rebuts them by clear and

United States District Court
Northern District of California

convincing evidence. *See* 28 U.S.C. § 2254(e)(1). In particular, the state appellate court's determination—that, as a matter of state law, Petitioner's evidence failed to lay a foundation for imperfect self-defense—is entitled to a presumption of correctness and therefore "should be the final word on the subject." *See Menendez v. Terhune*, 422 F.3d 1012, 1029-30 (9th Cir. 2005) (evidence did not support a claim of imperfect self-defense); *accord Murray v. Schriro*, 746 F.3d 418, 438 (9th Cir. 2014).

In addition, the state appellate court's determination that any error was harmless under the state law standard constitutes a finding that the error did not amount to a federal constitutional violation. *Ortiz v. Yates*, 704 F.3d 1026, 1033-34 & n.4 (9th Cir. 2012); *Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000). The mere fact that an instruction was incorrect under state law is not a basis for federal habeas relief. *Estelle*, 502 U.S. at 71-72. Petitioner had argued on direct appeal that the error was of constitutional magnitude and that prejudice should be assessed under either *Chapman v. California*, 386 U.S. 18 (1967) or *People v. Watson*, 46 Cal. 2d 818, 836 (1956). *See* Dkt. 1-1 at 26-28. However, the state appellate court relied on *People v. Minifie*, 13 Cal. 4th 1055, which assessed harmlessness under the California standard of prejudice. The state appellate court's implicit conclusion that the instructional error did not constitute a constitutional violation was not objectively unreasonable. *See Middleton v. McNeil*, 541 U.S. 433 at 437 (2004) (state court reasonably found no constitutional error where trial court gave three correct instructions on unreasonable self-defense and one instruction that incorrectly required reasonableness). As noted above, the state appellate court found that there was no substantial evidence to support imperfect self-defense, which is binding on this Court.

Moreover, the trial court correctly instructed on all the elements of imperfect self-defense as it applied to murder and attempted murder, pursuant to CALCRIM Nos. 571 and 604. 8RT 1576-1579; *see e.g., People v. Lopez*, 199 Cal. App. 4th 1297, 1306-07 (2011) (CALCRIM Nos. 571 and 604 correctly set forth the fundamental elements of imperfect self-defense). As explained above, the trial court instructed on the elements of imperfect self-defense, as follows: "The defendant actually believed that he was in imminent danger of being killed of suffering great bodily injury; and [¶] The defendant actually believed that the use of force was necessary to

defend against the danger, but at least one of those beliefs was unreasonable . . . . *In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant . . . .*" 8RT 1576-77, italics added.  Petitioner's claim relates to a "bracketed language" or the aforementioned italicized portion of the standard instructions addressing the permissible consideration of evidence of third party threats.  Under state law, this optional language is a "pinpoint" instruction which directs the jury's attention to particular evidence.  *See People v. Minifie*, 13 Cal. 4th at 1065-69; *see also People v. Sears*, 2 Cal. 3d 180, 190 (1970).)  The record supports the state appellate court's determination that any misinstruction on evidence of third party's threats as it related to imperfect self-defense had no impact on the outcome of trial.  As the state appellate court determined, Petitioner's defense was not predicated on evidence of actual third party threats.  *Donald*, 2015 WL 1250446, *4.  Specifically, as the appellate court pointed out, Petitioner "did not testify that he believed he would be shot from the other car if he did not fire first." *Id.*  Defense counsel did not argue imperfect self-defense in his closing argument, but instead focused on complete self-defense. *Id.*  Petitioner testified he believed the persons in the white Lexus could have been his rivals—possibly the Miles brothers, with whom he had a recent shootout.  This is not a situation where Petitioner believed that the victims were associated with his aforementioned rivals who had threatened him in the past.  Therefore, there is no reasonable likelihood the jury misapplied the instructions.  The instruction correctly told the jury that it must determine based on all the circumstances whether Petitioner actually believed he was in imminent danger.  Furthermore, the pinpoint instruction did not apply here because there was no evidence of third party threats that Petitioner associated with the victims.  Petitioner claimed he shot at the car because he thought it contained his rivals.  He may have associated the white Lexus with his enemies but he did not associate the occupants in that car (i.e., the victims) with anyone who posed a danger to him.  The state appellate court's rejection of this claim was not an unreasonable application of United States Supreme Court authority.

If error occurred, the federal habeas court must separately determine whether it had a substantial or injurious effect on the verdict. *Calderon*, 525 U.S. at 146 (citing *Brecht*, 507 U.S. at 637).  The *Brecht* standard requires more than a "reasonable possibility" that the error contributed

to the verdict; the writ should be granted "only where the petitioner 'can establish that it resulted in actual prejudice.'" *Morales v. Woodford*, 388 F.3d 1159, 1172 (9th Cir. 2004) (quoting *Brecht*, 507 U.S. at 637). Although the harmless error test is not just a determination of whether the other evidence was sufficient to support the verdict, the reviewing court does consider all the evidence to determine whether an error had a substantial and injurious effect on the verdict, so that an error is more likely to be considered harmless when the rest of the case against a defendant is particularly strong. *See Sims v. Brown*, 425 F.3d 560, 570-71, *amended by* 430 F.3d 1220 (9th Cir. 2005) (rejecting argument that district court improperly applied *Brecht* by assessing the strength of the state's evidence apart from the erroneously admitted statements, "because courts do review all the state's evidence to determine whether error had a substantial and injurious effect on the jury's verdict," and citing cases). In *Brecht* itself, the Supreme Court found the alleged error harmless, in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty." *Brecht*, 507 U.S. at 639; *see also Trillo v. Biter*, 769 F.3d 995, 1001-02 (9th Cir. 2014) (although prosecutor's statement in argument was improper, it was harmless under *Brecht* because it was a single statement and there was strong evidence of guilt).

As the state appellate court found, Petitioner did not present a defense of imperfect self-defense. Indeed, there was no substantial evidence of any imminent threat of great bodily injury posed by either victim. There was also no evidence that the victims took any action which would have led to an actual belief in the immediate need to act in self-defense. Petitioner testified that on the trip back to North Richmond he noticed a vehicle driving closely behind him with its headlights shining in his mirror. 6RT 1296. Petitioner asked his companions if there was a gun in the car, "Y'all sure we ain't got no gun in the car?" 6RT 1297-98. Costello handed him a gun. 6RT 1298. Petitioner turned right on Bissell Avenue from 23rd Street and noticed for the first time the car behind him was white. 6RT 1297. When the white car pulled up alongside them as they were stopped at the intersection, Petitioner "panicked" and fired numerous shots into the vehicle. 6RT 1298-99. Petitioner did not know whether the passenger window was partially down because he "couldn't really get a view because it happened too quick." 6RT 1299. He testified on cross-examination, however, that he thought "one possibility" was that it belonged to

12

the Miles brothers. 7RT 1389.

Under these circumstances, even if Petitioner *previously* had been shot by persons in a white car, the state appellate court reasonably found that Petitioner's evidence failed to lay a foundation for imperfect self-defense. No evidence existed showing that any behavior by the victims could possibly lead to an honest belief in the immediate need to act in self-defense, or that Petitioner even saw the occupants of the car before he fired numerous shots into it. Without some action by the victims to suggest an immediate need to use deadly force, there is no substantial evidence to support instructions on imperfect self-defense. Thus, no juror could have been misled by the challenged instruction.

Petitioner makes much of the defense evidence that he had lived through a difficult and violent youth and that previously he had been shot by persons in a white vehicle. Petitioner's alleged mental problems and post-traumatic stress disorder are insufficient under state law to establish a claim of imperfect self-defense. *See People v. Elmore*, 59 Cal. 4th 121, 136-37 (2014). *Elmore* explained,

> [U]nreasonable self-defense is not premised on considerations of mental disorder. From its earliest appearance in California law, unreasonable self-defense has been deemed to apply when the defendant's act was "'*caused by the circumstances*,'" rather than by cognitive defects alone. [Citations, italics added.] As we said in [*In re*] *Christian S*., [7 Cal. 4th 768 (1994)] unreasonable self-defense "is based on a defendant's assertion that he lacked malice . . . because he acted under an unreasonable *mistake of fact*—that is, the need to defend himself against imminent peril of death or great bodily harm." (*Christian S*., *supra*, 7 Cal. 4th at 779, fn. 3, italics added.)

*People v. Elmore*, 59 Cal. 4th at 136-37. For the reasons stated, even if Petitioner suffered from post-traumatic stress disorder, the state appellate court reasonably found that there was "overwhelming testimony from numerous witnesses that it was the van that pulled up beside the Lexus, leading to the unprovoked shooting." *Donald*, 2015 WL 1250446, *4. Such testimony was in contrast to Petitioner's testimony that he panicked when he observed the white Lexus approach his van from behind. *Id.*

Finally, Petitioner argues the instructions violated due process by misstating the elements of imperfect self-defense, lessening the prosecution's burden of proof with respect to the malice

13

element of murder and impairing his right to present a defense. As stated, the record shows that the trial court properly instructed on the elements of imperfect self-defense. The only error related to an irrelevant instruction on the consideration of evidence of third party threats, which is, at most, state law error alone. The jury was fully instructed on imperfect self-defense including the concept that if Petitioner actually but unreasonably believed there was the need to resort to deadly force to protect himself, then he was guilty only of voluntary manslaughter. Thus, the instruction did not lessen the prosecution's burden of proof, and Petitioner was permitted to present his defense. Even assuming there was federal constitutional error, for the reasons stated above any error was harmless under *Brecht*.

Accordingly, Petitioner is not entitled to habeas relief as to this claim, and it is DENIED.

### B. Instructional Error - Failure to Instruct on the Effect of Voluntary Intoxication on Imperfect Self-Defense

Petitioner argues that "the trial court's instructions, which precluded jurors from considering intoxication with respect to anything except intent, premeditation, and deliberation, were error[neous]: the instructions prohibited jurors from considering whether express malice was negated by imperfect self-defense." Dkt. 1 at 5; Dkt. 1-1 29-40.

The appellate court found that failure to instruct on the effect of voluntary intoxication on imperfect self-defense did not violate due process, stating as follows:

> As noted above, evidence was introduced that defendant may have been intoxicated at the time of the shooting. With regard to voluntary intoxication, the jury was instructed, pursuant to CALCRIM No. 625, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose." Defendant did not request any additional instructions on voluntary intoxication, but argues on appeal that this instruction "erroneously and unconstitutionally" precluded jurors from considering defendant's intoxication in deciding if defendant actually but unreasonably believed he was in imminent danger and needed to use deadly force to protect himself. We disagree.
>
> The parties argue extensively about whether voluntary intoxication may be considered by the jury in evaluating a defendant's subjective belief in the need to defend. However, we need not be drawn into this dispute because there is no likelihood the instruction, even if

United States District Court
Northern District of California

erroneous, was prejudicial. The evidence of defendant's intoxication was relatively limited and voluntary intoxication was not raised by defense counsel in closing argument.[FN 3] While defendant testified to his use of drugs and alcohol before getting in the van, he also testified that he told the police following his arrest that he was not too intoxicated to drive. Having found defendant guilty of first degree murder, the jury necessarily found that defendant's intoxication was not to such a degree that it interfered with his formation of the intent to kill or premeditation and deliberation.[FN 4] Finally, the prosecutor made no specific statement suggesting the jury could not consider intoxication when evaluating defendant's subjective state of mind in connection with imperfect self-defense. The imperfect self-defense instructions explicitly told the jury to consider all the circumstances from the defendant's perspective when determining defendant's subjective beliefs, stating: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant." (CALCRIM No. 571.) These circumstances presumably would include evidence that defendant's perceptions were affected by his drug and alcohol use. There is no probability that the outcome would have been different if the jury had been provided an additional instruction directed explicitly to the use of the intoxication evidence in considering voluntary manslaughter.

[FN 3:] In closing argument, the prosecution argued, "I expect that you're going to hear some argument from [defense counsel] about voluntary intoxication. And the court will instruct you on that as to which crimes and which elements of which crimes you may consider that. And, as to the other elements that are not specifically listed in the instruction, you may not consider voluntary intoxication as a defense." Defense counsel did not, however, discuss voluntary intoxication in his closing argument.

[FN 4:] The jury was instructed on first degree murder pursuant to CALCRIM No. 521 in relevant part as follows: "The defendant has been prosecuted for first degree murder under two theories: (1) 'the murder was willful, deliberate, and premeditated' and (2) 'the murder was committed by shooting from a vehicle.' [¶] Each theory of first degree murder has different requirements, and I will instruct you on both. [¶] . . . [¶] A. Deliberation and Premeditation [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] . . . [¶] G. Discharge From Vehicle [¶] The defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle. The defendant committed this kind of murder if: [¶] 1. He shot a firearm from a motor vehicle; [¶] 2. He intentionally shot at a person who was outside the vehicle; [¶] AND [¶] 3. He intended to kill that person."

*Donald*, 2015 WL 1250446, *4.

The state appellate court's finding that there was no probability an additional instruction on intoxication would have any effect on the outcome was not an unreasonable application of Supreme Court authority. Although Petitioner testified that he took two Valium pills, four Ecstacy pills, and drank alcohol on the night of the shooting to relieve his "mental[] and physical[]" pain, he did not claim he was intoxicated. 6RT 1292. Indeed, he told the police he was not too intoxicated to drive. 6RT 1313-1314. Moreover, as the appellate court noted, the jury was instructed that it could consider voluntary intoxication on the issue of whether Petitioner had the intent to kill and whether that he acted with premeditation and deliberation. *Donald*, 2015 WL 1250446, *4. Nonetheless, the jury found that Petitioner possessed those mental states when he shot the victims—convicting him of first degree murder and attempted murder. Therefore, it is likely that the jury was not convinced that Petitioner was too intoxicated to form the premeditated intent to kill. If the jury found voluntary intoxication did not affect his intent to kill, then it necessarily rejected the notion that intoxication affected his alleged belief in that he needed to act in self-defense. Thus, there was no reasonable likelihood the jury misunderstood the instructions on intoxication. *Estelle v. McGuire*, 502 U.S. at 72. The state appellate court's rejection of Petitioner's instructional error claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

For similar reasons, Petitioner has not otherwise satisfied the standard for habeas relief based on instructional error, which requires a showing that such an error "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Here, the state appellate court determined that even if error had occurred, it did not raise a federal constitutional issue, and that any error was harmless. *Donald*, 2015 WL 1250446, *4. As the appellate state court indicated, the verdict of first degree murder shows "the jury necessarily found that [Petitioner's] intoxication was not to such a degree that it interfered with his formation of the intent to kill or premeditation and deliberation." *Id.* The state appellate court further pointed out that the prosecutor "made no specific statement suggesting the jury could not consider intoxication when evaluating [Petitioner's] subjective state of mind in connection with imperfect self-defense."

16

*Id.* Additionally, Respondent argues that the evidence that Petitioner did *not* act in self-defense was strong. Dkt. 10-1 at 22 (emphasis in original). Respondent further argues as follows: "The fact that people in a white car may have shot at Petitioner at some point in the past does not justify his resort to deadly force in this case because the victims did nothing to suggest Petitioner was in imminent danger of great bodily injury." *Id.* This Court agrees. Finally, in making the determination that an alleged error has no substantial and injurious effect on the verdict, the Court should consider the strength of the prosecution's evidence. Here, the evidence of guilt was overwhelming, and, as mentioned above, the state appellate court pointed out that "the prosecutor's cross-examination brought out numerous inconsistencies in [Petitioner's] testimony and repeated admissions of past lies." *Donald*, 2015 WL 1250446, *4.

Accordingly, Petitioner is not entitled to relief on this claim of instructional error, and it is DENIED.

### C. Prosecutorial Misconduct and Trial Court's Erroneous Response to Jury Question Relating to "Reasonable Person" Standard

Petitioner contends the prosecutor committed misconduct by allegedly misstating the law during his closing argument when describing an "erroneously narrow 'reasonable person' standard." Dkt. 1 at 5; Dkt. 1-1 at 43-45. He also argues the trial court compounded the alleged error by giving an incorrect supplemental instruction in response to a jury inquiry relating to the "reasonable person" standard. Dkt. 1 at 5; Dkt. 1-1 at 45-49.

The state appellate court rejected these claims, stating as follows:

> In his closing argument, the prosecutor argued as follows: "Now, the reasonable person is not the reasonable gang member . . . . You hear this term in the law a lot. There's no set definition of what a reasonable person is. But I can tell you a few things that the reasonable person is not . . . . [A] reasonable person does not suffer from any form of mental illness. A reasonable person is not under the influence of controlled substances. And as I said before, the reasonable person is not part of a gang. [¶] . . . [¶] A reasonable person who is not mentally ill, who is not impaired, who is not in a gang, who is not someone who has chosen to go and get into shootouts with people, that person would not do the actions that the defendant did. And again, to the extent they're now looking to that standard to say a reasonable person would have done those things, he falls short. He cannot now rely on these things he claims to be part of his life story, his mental illness, his drug use, and his gang affiliation. He cannot use that to say that a reasonable person would

17

have done what he did on that night."

During deliberations, the jury asked: "Is there a jury instruction defining the term reasonable &/or reasonable person. We're not able to find it. Is [the prosecutor's] definition correct?" The court responded: "Please clarify as to your specific request regarding 'reasonable person.' We are unclear on your question." The jury then asked: "We did not find in the jury instruction packet a definition of either 'reasonable' or 'reasonable person.' We are wondering if the court read one to us, but we didn't get it. A related question is whether [the prosecutor] was reciting a specific binding definition when he wrote [sic] what a reasonable person is, i.e., not a gang member, not a person with mental illness & not a person who is intoxicated." Relying on *People v. Jefferson* (2004) 119 Cal. App. 4th 508, 519, the court responded to the jury note as follows: "The law defines a reasonable person as an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be."

Defendant contends that the prosecutor misstated the law and the trial court erred in responding to the jury's question, giving the jury an erroneously narrow "reasonable person" standard. We disagree.

In determining whether a defendant's belief in the need to defend himself is objectively reasonable, "a jury must consider what would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.] To do this, it must consider all the ""facts and circumstances . . . in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety."" [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .'" (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1082-1083 [Evidence of battered women's syndrome is relevant, and, thus, admissible to establish defendant's situation and knowledge for purposes of self-defense.].) As the court in *Humphrey* noted, however, "we are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ""reasonable gang member" standard.' . . . The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable person, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the jury, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable." (*Id.* at p. 1087.)

The prosecutor's argument that a reasonable person is not a reasonable gang member or one who is suffering from mental illness or is under the influence of controlled substances was not, as defendant suggests, a misstatement of the law. (*People v. Humphrey, supra,* 13 Cal. 4th at p. 1087; *People v. Jefferson, supra,* 119 Cal. App. 4th at p. 519 ["By definition, a reasonable person is

18

not one who hears voices due to severe mental illness."]; *People v. Steele* (2002) 27 Cal. 4th 1230, 1252-1253 ["Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War . . . may have satisfied the subjective element of heat of passion. [Citation.] But it does not satisfy the objective, reasonable person requirement, which requires provocation by the victim."].) Likewise, the court's response to the jury was an accurate statement of the law taken verbatim from *People v. Jefferson, supra,* 119 Cal. App. 4th at page 519. It was not, as defendant suggests, too narrow, particularly because the jury was instructed, pursuant CALCRIM No. 505, that in deciding whether defendant's actions were reasonable it must consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."

*Donald*, 2015 WL 1250446, *5.

### 1. Prosecutorial Misconduct

### a. Applicable Law

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Prosecutorial misconduct that rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012); *see also Brecht*, 507 U.S. at 637-38.

Because the standard of review on federal habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power," even improper argument does not necessarily violate a defendant's constitutional rights. *Darden*, 477 U.S. at 180; *Parker v. Matthews*, 567 U.S. 37, __, 32 S. Ct. 2148, 2153 (2012) (per curiam) (*Darden* constitutes the relevant clearly established Supreme Court law for a claim of prosecutorial misconduct in closing arguments, and is a general standard that affords state court broad leeway for its application.). A petitioner is not entitled to habeas corpus relief in the absence of a due process violation even if the prosecutor's comments were "undesirable, erroneous, or even 'universally condemned.'" *Donnelly v.*

19

*DeChristoforo*, 416 U.S. 637, 642 (1974).

###### b.  Analysis

Petitioner claims that the prosecutor committed misconduct by misstating the law and giving the jury an erroneously narrow "reasonable person" standard.  Dkt. 1 at 5; Dkt. 1-1 at 43-45.  Petitioner's argument lacks merit.

The state appellate court found that the prosecutor's argument—that a reasonable person is not a reasonable gang member or one who is suffering from mental illness or is under the influence of controlled substances—was not a misstatement of the law.  *Donald*, 2015 WL 1250446, *5.  The state appellate court pointed out that, under California law, "[b]y definition, a reasonable person is not one who hears voices due to severe mental illness."  *Id.* at *5 (citing *People v. Jefferson*, 119 Cal. App. 4th 508, 519 (2004)).  "In blunt fashion, [the California] Supreme Court long ago defined a reasonable person as a "'normal person.'"  *Jefferson*, 119 Cal. App. 4th at 519 (quoting *Katz v. Helbing*,  205 Cal. 629, 638 (1928)).  "The reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be."  *Jefferson*, 119 Cal. App. 4th at 519.   The state appellate court also acknowledged that under California law, a reasonable person is not under the influence of controlled substances.  *Donald*, 2015 WL 1250446, *5 (citing *People v. Steele*, 27 Cal. 4th 1230, 1252-1253 (2002)).  Finally, the state appellate court also cited to *People v. Humphrey*, which concerned the admission of expert testimony regarding battered women's syndrome and held that such expert testimony was generally relevant to the subjective existence and objective reasonableness of the defendant's belief in the necessity of self-defense.  *Donald*, 2015 WL 1250446, *5 (citing *People v. Humphrey*, 13 Cal. 4th 1073, 1076 (1996)).  In *Humphrey*, the state supreme court observed that the objective reasonableness of the defendant's belief must be considered from the perspective of "'a reasonable person in a similar situation and with similar knowledge.'"  13 Cal. 4th at 1082-83.  Furthermore, "'a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind.'"  *Id.* at 1083 (quoting *People v. Smith*, 151 Cal. 619, 628 (1907)).  The state supreme court held as follows: "Although the ultimate test of reasonableness is objective, in determining whether a

reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself." *Id.* at 1083. The state supreme court rejected the Attorney General's claim that it was "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard." *Id.* at 1087. Thus, the state supreme court noted: "Our decision would not, in another context, compel adoption of a '"reasonable gang member" standard.'" *Id.*

The federal courts "must look to state law for 'the substantive elements of the criminal offense.'" *Coleman v. Johnson*, 566 U.S. 650, __, 132 S. Ct. 2060, 2064 (2012) (per curiam); *accord Hicks*, 485 U.S. at 629 (rejecting argument that state appellate court erred in determining the elements of the offense of contempt, because "We are not at liberty to depart from the state appellate court's resolution of these issues of state law."); *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) ("We accept, as we must, the California Supreme Court's identification of the elements of the offense."); *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state court's holding on what constitutes the elements of the offense is a state law determination that "is not open to challenge on habeas review"). As the state appellate court found, the prosecutor did not misstate the law by commenting that the reasonable person standard did not include mentally ill persons, intoxicated persons, or gang members. *Donald*, 2015 WL 1250446, *5. Therefore, the state appellate court's determination of what California law requires is binding on this Court. Accordingly, Petitioner is not entitled to habeas relief, and his prosecutorial misconduct claim is DENIED.

### 2. Response to Jury Question

#### a. Applicable Law

Whenever a jury "makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion. *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004). The formulation of the response to a jury's question is a stage at which defense counsel can make a valuable contribution. *See Musladin v. Lamarque*, 555 F.3d 830, 839-41 (9th Cir. 2009)

(discussing importance of defense counsel's participation in the formulation of a response to a jury question).

When a trial judge responds to a jury question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, and the jury asks no follow up question, a reviewing court may "presume[] that the jury fully understood the judge's answer and appropriately applied the jury instructions." *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009). The trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003). And just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

To obtain habeas relief following an allegedly erroneous response to a jury question, a petitioner must show constitutional error resulted and that the error was not harmless. *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Johnson v. Texas*, 509 U.S. 350, 367-68 (1993) (quoting *Boyde v. California*, 494 U.S. 370 (1990)). "That inquiry also can be described as having two parts: (1) whether there is a reasonable likelihood that the jury understood an assertedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, 'whether the instruction, so understood, was unconstitutional as applied to the defendant.'" *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001) (quoting in part *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)).

### b. Analysis

Here, Petitioner has failed to demonstrate that the trial court's response to the jury question infringed upon his constitutional rights. As an initial matter, the Court is bound by the state appellate court's determination that the trial court's response to the jury was an "accurate statement of the law taken verbatim from *People v. Jefferson*, *supra*, 119 Cal. App. 4th at page 519." *Donald*, 2015 WL 1250446, \*5. Such a determination must be accepted on federal habeas review. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988) (federal court must accept state court's

interpretation of state law).  In any event, no constitutional error resulted because the jury was not reasonably likely to interpret the trial court's response in the manner that Petitioner claims when viewed in the context of the overall charge.  *See United States v. Harrison*, 34 F.3d 886, 889 (9th Cir. 1994) (A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.).  As noted by the state appellate court, CALCRIM No. 505 instructed jurors that "in deciding whether defendant's actions were reasonable it must consider 'all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.'" *Donald*, 2015 WL 1250446, *5.

Petitioner further argues the alleged error violated due process by lightening the prosecution's burden of disproving self-defense and suggesting that Petitioner's past experiences were irrelevant.  Dkt. 1-1 at 46-52.  However, such an argument is unavailing.  As stated by the state appellate court, the jury was fully and correctly instructed with the reasonable person standard under CALCRIM No. 505, which directs the jury to "consider what a reasonable person in a similar situation with similar knowledge would have believed." *Donald*, 2015 WL 1250446, *5.  The state appellate court's rejection of these claims was not an unreasonable application of Supreme Court authority.

In any event, the alleged error had no "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 637.  Even if the trial court's supplemental instruction was incorrect or misleading, there would have been no impact on the verdict.  As set forth above, there is no substantial evidence that a reasonable person in Petitioner's situation would have believed that resorting to deadly force was justified based on an imminent threat of great bodily injury.

Accordingly, the state appellate court's denial of this claim was not objectively unreasonable.  Therefore, Petitioner is not entitled to habeas relief for his claim relating to the trial court's allegedly inadequate response to a jury question, and the claim is DENIED.

**D.     Trial Court Erred in Allowing Prosecutor to Question Defense Witness About Petitioner's Prior Murder Charge**

Petitioner claims that the trial court erred in allowing the prosecutor to cross-examine defense character witness Lisa Wilson (Petitioner's former foster mother) about whether she knew Petitioner had been charged with murder in Marin County.  Dkt. 1 at 8-9; Dkt. 1-1 at 53-63.

The state appellate court rejected this claim, stating as follows:

> Prior to trial, defense counsel moved to exclude evidence of any prior alleged criminal acts or uncharged misconduct by defendant, including a homicide alleged to have occurred in Marin County on November 30, 2009.  The prosecutor at that time indicated that he was not planning to introduce reports from the Marin County case.  However, the issue did arise a number of times during trial.

> First, on cross-examination, the prosecution gang expert was asked what documents he reviewed in coming to his conclusions about defendant's gang membership.  He explained that he had testified in a case in Marin County involving defendant.  Defense counsel asked the expert, "This time that you testified in Marin about Nickie Donald, that case was eventually dismissed against Nickie Donald, correct?"  The expert responded, "I don't know the exact disposition of that case.  I'm not sure."  Thereafter, defense counsel made a motion for a mistrial because the prosecutor had agreed not to introduce such evidence and the prosecution expert should have known not to refer to the matter.  The prosecutor noted that the matter had been addressed in a sidebar conference and that the witness did his best to avoid going into improper matters.  The court agreed that the matter was discussed at the bench and that it had suggested that defense counsel narrow his cross-examination "because it was so open-ended that I thought the inspector had no choice but to answer in the way he did."  The court continued, "You [defense counsel] did not want to narrow the focus because then you thought the jury might think that there were other matters in other counties and it would be worse that way . . . . [Y]ou said you were going to go into the matter anyway because the case had been dismissed."  The court concluded that any error was invited, and denied the motion for a mistrial.  The court also noted that defense counsel had declined a curative instruction.

> Later, before defendant's character witnesses testified, the prosecution indicated that the Marin case could potentially come up again during the cross-examination of defendant's character witnesses "if they're saying he's this gentle person who would only, you know, act . . . to protect himself or to protect others."  The trial court agreed that if the witnesses were to testify to defendant's good character, that would "open the door to have you heard type questions."

> Thereafter, Lisa Wilson, defendant's former foster mother, testified that defendant "was a good kid . . .  He was good in school, had good grades, played football, did wonderful."  She never saw him with any guns or being violent to anyone.  When she heard that he

had been charged with murder in this case she was "surprised and still is surprised because he wasn't that type of kid." On cross-examination, Wilson testified that after she moved from Richmond in 2007, she had less direct contact with defendant. She explained, "my daughter kept more contact with [him] than I did. I always checked on them, but they had more . . . ." When asked whether she had heard or was she aware "that there was a separate arrest for murder in Marin County where Mr. Donald was prosecuted for a completely separate incident from 2009," she responded "no." She indicated that this was the first time she had heard about the additional murder charge in Marin. Wilson was surprised to hear that "something else happened." Shortly after the above questioning, the trial court instructed the jurors as follows: "Ladies and gentlemen, I want to caution you about the testimony you've just heard or the questions and answers you've just heard. The questioning is in order to find out whether or not Ms. Wilson's opinion would change about the defendant if she knew about another incident. It is not offered for the truth of the incident. It's simply offered to see if her perspective about him has changed. So I want to make sure that everybody understands that. It's a limited purpose."

On appeal, defendant does not challenge the trial court's ruling with respect to the testimony of the prosecutor's gang expert, but contends that the court erred allowing the prosecutor to question Wilson about the Marin murder charge. Defendant does not dispute that "[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony." (*People v. Wagner* (1975) 13 Cal. 3d 612, 619 ["The rationale allowing the prosecution to ask such questions (in a 'have you heard' form) is that they test the witness' knowledge of the defendant's reputation."].) He argues, however, where the witness's opinion of the defendant is based solely on personal knowledge and not reputation, such questions do not serve the rationale of the rule and should not be permitted. (*See People v. Hurd* (1970) 5 Cal. App. 3d 865, 879-880, superseded by statute as stated in *People v. Tobias* (2001) 25 Cal. 4th 327, 332 [Defendant's argument that the "rationale does not apply where, as here, the good-character witness does not testify to defendant's reputation but states his opinion of defendant's character" is not "without some logic" but finding no error because in that case, as "[i]n many instances, the opinion of a personal acquaintance will necessarily be based upon a mixture of personal knowledge or observation of the defendant and a knowledge of his reputation in the community."].)

As in *Hurd*, the factual predicate for defendant's argument is not supported by the record. Wilson's testimony that defendant was a good kid was based both on her personal experience with him as his foster parent and on what she had learned by checking on him through his relationship with her daughter. Her opinion necessarily was based upon both personal knowledge and reputation. The murder did not take place "long after the period she testified about," as suggested by defendant. Wilson testified that she had less contact with defendant after she moved in 2007 and that the last time she

25

saw defendant in person was about a year before his arrest in June 2010. She apparently had heard nothing in that time that had changed her opinion of defendant as not the "type of kid" to commit such a crime because she was "surprised" by both the present charges and the Marin charge. In any event, in light of the court's clear admonition, it is not reasonably probable the jury would have reached a more favorable verdict had the evidence been excluded. (*People v. Watson* (1956) 46 Cal. 2d 818, 836; *People v. Frank* (1990) 51 Cal. 3d 718, 728 [jurors are presumed to follow the court's limiting instructions].) The fact that the jury found the gang enhancement allegations not true strongly suggests that it was not biased against defendant based on the testimony about the Marin case. (Cf. *People v. Mendibles* (1988) 199 Cal. App. 3d 1277, 1312 ["that defendant was acquitted of any of the offenses suggests the lack of prejudice and the jury's clear ability to consider each count on the evidence prescribed and nothing else"].)[FN 5]

[FN 5:]    For the same reason, we reject defendant's related contention that the court erred in allowing the prosecution to cross-examine defendant's gang expert regarding the Marin case. After establishing that the expert was aware of the Marin case but had not read the reports, the expert answered affirmatively to the prosecutor's question whether, even if the charges were dismissed, the incident would "still be significant . . . [to] a person's gang affiliation?" Any potential error in admitting this testimony was harmless under any standard.

*Donald*, 2015 WL 1250446, *6-7.

A State's criminal law (such as an evidentiary rule pertaining to criminal trials) does not violate the Due Process Clause "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37 (1996). "It is not the State which bears the burden of demonstrating that its rule is deeply rooted, but rather respondent who must show that the principle of procedure violated by the rule (and allegedly required by due process) is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 47 (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)) (internal quotation marks omitted) (rule that intoxication may be considered on the question of intent was not so deeply rooted as to be a fundamental principle enshrined by the Fourteenth Amendment). Simply finding a historical basis for or against a rule is not enough: "The Constitution does not encompass all traditional legal rules and customs, no matter how longstanding and widespread such practices may be. The Supreme Court has cautioned against the wholesale importation of common law and evidentiary rules into the Due Process Clause of [the] Constitution." *United States v. LeMay*, 260 F.3d 1018, 1024-25 (9th Cir. 2001). The "rule

or practice must be a matter of 'fundamental fairness' before it may be said to be of constitutional magnitude." *Id.* at 1025 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Here, the state appellate court reasonable rejected the claim that the aforementioned cross-examination of Wilson deprived Petitioner of a fair trial.[2] The state appellate court considered and interpreted relevant state law (involving the rules regarding impeaching character witnesses) to determine that no error had occurred. Again, such an interpretation of state law is binding on a federal court sitting in habeas corpus. *See Bradshaw*, 546 U.S. at 76. Petitioner's due process claim is premised on his assertion that state law was improperly applied to his case, but this Court is bound to accept the state appellate court's determination that state law was properly applied in his case. *See id.* Therefore, his due process claim fails. Furthermore, Respondent argues that "the state evidentiary rule that permits the prosecution to inquire of a defense character witness whether he or she has heard of acts or conduct by the defendant inconsistent with the witness'[s] testimony does not offend any rooted principle of justice." Dkt. 10-1 at 35. This Court agrees. The state appellate court's determination that no error occurred and that Petitioner was not deprived of a fair trial was not an unreasonable application of Supreme Court authority.

In any event, the alleged error did not have a "'substantial and injurious effect'" on the verdict. *Brecht*, 507 U.S. at 637. As the state appellate court noted, the trial court admonished the jury that the questioning was "not offered for the truth of the incident" but simply "to find out whether or not Ms. Wilson's opinion would change about [Petitioner] if she knew about another incident [i.e., the Marin case]." *Donald*, 2015 WL 1250446, *6. The state appellate court also noted that fact that "the jury found the gang enhancement allegations not true strongly suggest[ed] that it was not biased against [Petitioner] based on the testimony about the Marin case." *Id.* at *7. As discussed above, overwhelming evidence exists showing Petitioner's guilt and that he did not act in self-defense. The evidence shows that Petitioner shot the victims after they had pulled up next to him in a white Lexus, and that they did nothing to provoke the shooting. Therefore, under

---

[2] In the instant action (similar to his direct appeal), Petitioner's due process claim only relates to the cross-examination of Wilson, and he does not challenge the trial court's ruling with respect to the testimony of the prosecutor's gang expert.

these circumstances, any error was harmless.

Accordingly, Petitioner is not entitled to habeas relief on this claim, and it is DENIED.

### E. Cumulative Error

Petitioner claims the cumulative impact of the alleged errors deprived him of a fair trial. Dkt. 1 at 9; Dkt, 1-1 at 64-66.  Because Petitioner has not shown a single constitutional error, his cumulative error claim necessarily fails.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  Therefore, the state appellate court's denial of this claim of cumulative error was not objectively unreasonable. *See Donald*, 2015 WL 1250446, *7.  Accordingly, relief on this claim is DENIED.

## V. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case.  For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  *See Slack*, 529 U.S. at 484.  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.      Petitioner's claims in his petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.      The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: April 17, 2017

YVONNE GONZALEZ ROGERS
United States District Judge